In the Matter of STANDARD FOOD PRODUCTS CORP., Appellant, against JOHN F. O'CONNELL et al., as Members of the State Liquor Authority, Respondents.

Argued April 8, 1946; decided October 17, 1946.

*George Morton Levy* for appellant. I. Petitioner made no sales or deliveries to unlicensed persons within the meaning of the statute. (*Matter of Sears, Roebuck & Co.* v. *McGoldrick,* 279 N. Y. 184.) II. The doctrine of *respondeat superior* does not apply in this case. (*Cullinan* v. *Burkard,* 93 App. Div. 31.) III. The action of the Liquor Authority was arbitrary and capricious. (*Matter of Toyos* v. *Bruckman,* 266 App. Div. 28.)

*Alvin McKinley Sylvester, Harry F. Karst* and *Jack Reinstein* for respondents. I. There was substantial and competent evidence to sustain the findings by the authority that petitioner sold and delivered alcoholic beverages to persons not duly licensed under the Alcoholic Beverage Control Law. (*People* v. *Hawk,* 156 Misc. 870, 268 N. Y. 678; *Matter of Savoy Associates, Inc.,* v. *Valentine,* 266 App. Div. 63; *Matter of Cullinan* [*Niederstein Cert.*], 88 App. Div. 6; *Matter of Goodstein* v. *State Liquor Authority,* 252 App. Div. 729; *Matter of Wallach* v. *State Liquor Authority,* 251 App. Div. 822; *People ex rel. Klein* v. *Bruckman,* 248 App. Div. 807; *Matter of Orazio,* 247 App. Div. 897; *Matter of Cullinan* [*McCue Cert.*], 39 Misc. 636; *Matter of Lyman,* 29 Misc. 524; *Cullinan* v. *Burkard,* 93 App. Div. 31; *People* v. *Werner,* 174 N. Y. 132; *People* v. *D'Antonio,* 150 App. Div. 109.) II. The determination of the authority was neither

capricious nor arbitrary and was based solely upon the evidence adduced at the hearing. (*Matter of Miller* v. *Kling*, 291 N. Y. 65; *Matter of Valentino* v. *O'Connell*, 268 App. Div. 812; *Matter of Yates* v. *Mulrooney*, 245 App. Div. 146; *Matter of Townley* v. *Bruckman*, 168 Misc. 422; *People ex rel. Regan* v. *Enright*, 240 N. Y. 194; *People ex rel. Morrissey* v. *Waldo*, 212 N. Y. 174; *People ex rel. O'Callahan* v. *French*, 123 N. Y. 636; *People ex rel. Masterson* v. *French*, 110 N. Y. 494; *Bertholf* v. *O'Reilly*, 74 N. Y. 509; *Matter of Fortino* v. *State Liquor Authority*, 273 N. Y. 31; *People ex rel. Joline* v. *Willcox*, 198 N. Y. 433.)

DYE, J. The State Liquor Authority has suspended for a period of thirty days the wholesale liquor license held by the petitioner-appellant and has directed a forfeiture of its bond.

According to the record before us, the petitioner-appellant is engaged in the wholesale liquor business in the city of New York, serving between 3,500 and 4,000 customers to whom it makes deliveries in its own trucks except in the Staten Island area where a licensed liquor truckman is hired. Due to the unusual demands for popular brands of whiskey, the leading distillers developed a practice of furnishing wholesalers with allocation lists wherein specified quantities of whiskey were allotted to retailers listed therein. Such a list was furnished by Carstair's Distilling Company to the petitioner-appellant who gave copies of it to its salesmen for use in their assigned territories, without checking same for current license holders. The practice of petitioner was to accept the list as accurate and to rely on its salesmen who were instructed to check on the retailer's license when taking an order, to list the license number on the order and to take no orders from any unlicensed retailer. The same instructions were applicable to truckmen making deliveries. A salesman, employed by the petitioner-appellant and assigned to the Staten Island territory, discovered that Carstair's allocation list contained the names and addresses of retailers who had gone out of business or who, for various reasons, were not currently licensed to sell whiskey. This discrepancy suggested a scheme, the execution of which furnished the basis of the charges herein. It worked in this fashion: The salesman made out a fake order in the name of the nonexistent or unlicensed retailer, noting thereon a fictitious

license number and marking it for C.O.D. delivery. This fake order was then processed in the same manner and along with genuine orders. In the usual course, a package containing the whiskey called for by the fake purchase slip was sent to the delivery platform, together with a C.O.D. delivery receipt, and was there picked up by Wacker's Express, a licensed liquor truckman regularly hired by the appellant. By prearrangement the driver of the express truck delivered the whiskey to the salesman who put up the cash called for by the C.O.D. invoice. The truck driver then signed the delivery receipt in the name of the presumed purchaser with an illegible signature and turned it into the office along with the cash and the genuine receipts for bona fide transactions. The fake order, having been handled as a C.O.D., had never passed through the credit department where it would have been subjected to a check before delivery. In this manner, many small lots of whiskey, aggregating about thirty-six cases, were diverted. One step in the normal procedure was overlooked and led to its exposure. The scheme was uncovered when the petitioner-appellant, in keeping with routine office practice, mailed a paid invoice containing an itemized statement of the transaction to an unlicensed retailer whose name had been used by the dishonest salesman in furtherance of his fraudulent scheme and such person, on receipt of the paid invoice, knowing that it had neither purchased nor received the Carstair's whiskey mentioned, reported it to the State Liquor Authority who made an investigation which revealed the above circumstances.

This appeal brings up for review the sufficiency of this evidence as a matter of law to sustain the determination of the State Liquor Authority that the appellant had made sales of alcoholic beverages to unlicensed persons within the meaning of the statute. Section 100, subdivision 2, of the Alcoholic Beverage Control Law provides: " No manufacturer and no wholesaler shall sell, or agree to sell or deliver in this state any alcoholic beverage for the purposes of resale to any person who is not duly licensed pursuant to this chapter to sell such beverages, at wholesale or retail, as the case may be, at the time of such agreement and sale."

Section 3, subdivision 28, reads as follows: " ' Sale ' means any transfer, exchange or barter in any manner or by any means

whatsoever for a consideration, and includes and means all sales made by any person, whether principal, proprietor, agent, servant or employee of any alcoholic beverage and/or a warehouse receipt pertaining thereto. ' To sell ' includes to solicit or receive an order for, to keep or expose for sale, and to keep with intent to sell and shall include the delivery of any alcoholic beverage in the state.''

The statutory definitions in section 3, subdivision 28, broad as they are, do not of themselves enlarge the prohibition contained in section 100, subdivision 2, but depend, as do other regulatory statutes, upon proof of a clear violation of the prohibited acts before the penalty provisions will be enforced. We have heretofore held that when acts not *mala in se* are to result in loss or impairment of life, liberty or property the applicable statute should be narrowly construed (*People* v. *Shakun,* 251 N. Y. 107), and that '' considerations of expediency '' must not outweigh a lack of proof (*People* v. *Wallace & Company,* 282 N. Y. 417, 420). Similarly, a license to engage in the liquor business, even though frequently referred to as a privilege and not a right, when it has been issued and acted upon by the holder, should be subject to revocation or suspension only upon competent proof showing a clear violation of the applicable regulatory provision. Under the proof in this record we are unable to say that the petitioner-appellant sold or agreed to sell or deliver alcoholic beverages to unlicensed persons for the purpose of resale. The proof shows that the liquor was not ordered or received, or price paid therefor, by the unlicensed person named on the purchase slip — his name, in fact, being used, without knowledge or authority, to conceal a fraudulent diversion. The only testimony in the record regarding the ultimate disposition of the liquor is that the salesman — the actual recipient — used some for his personal consumption and gave the rest to his friends. Both the petitioner-appellant and the purported purchaser were the victims of a fraudulent scheme engineered by a dishonest employee, and there is no factual support for the conclusions that the petitioner-appellant either sold or agreed to sell or deliver liquor to any unlicensed person for the purpose of resale, as defined by the statute.

While it may be said that the petitioner-appellant was lax in the conduct of its business, the suspension of its license and the

forfeiture of its bond cannot be supported on the theory of its neglect or failure to discover that the fake purchaser was unlicensed, for nondiscovery was not the violation with which the petitioner-appellant was charged.

The order of the Appellate Division should be reversed and the determination of the State Liquor Authority annulled, with costs in this court and in the Appellate Division.

CONWAY, J. (dissenting). This proceeding was instituted to obtain a review of a determination and order made by the State Liquor Authority (hereinafter referred to as Authority) suspending the wholesale liquor license of the petitioner, Standard Food Products Corp. (hereinafter referred to as Standard) for a period of thirty days and making demand upon Standard and the surety company which executed the bond in connection with the issuance of the license, for the penal sum provided for therein. The determination by the Authority was made after hearing and resulted in the sustaining of seven charges of violations of section 100, subdivision 2, of the Alcoholic Beverage Control Law. That subdivision reads as follows: " 2. No manufacturer and no wholesaler shall sell, or agree to sell or deliver in this state any alcoholic beverage for the purposes of resale to any person who is not duly licensed pursuant to this chapter to sell such beverages, at wholesale or retail, as the case may be, at the time of such agreement and sale."

In order to make the prohibition against a violation of that subdivision as broad and far reaching as possible, for it was of vital importance in carrying out the policy of the State (§ 2), the Legislature made its own definition of a " sale ". It defined it as follows in section 3, subdivision 28: " 28. ' Sale ' means any transfer, exchange or barter in any manner or by any means whatsoever for a consideration, and includes and means all sales made by any person, whether principal, proprietor, agent, servant or employee of any alcoholic beverage and/or a warehouse receipt pertaining thereto. ' To sell ' includes to solicit or receive an order for, to keep or expose for sale, and to keep with intent to sell and shall include the delivery of any alcoholic beverage in the state." Thus the Legislature not only provided for the conventional sale defined in the Personal Property Law, section 82, but it provided that the words " to sell " as

used in section 100, subdivision 2, should include the receipt of an order or even the keeping of an alcoholic beverage with intent to sell it. Finally such words were defined to include the delivery of an alcoholic beverage in the State to *anyone,* for the one to whom such delivery might be made was not specified.

Standard, a wholesaler, (Alcoholic Beverage Control Law, § 3, subd. 35) over a period of nine months accepted and placed upon its books, through its duly authorized employee and agent, orders for the sale and delivery of liquor (§ 3, subd. 19) to unlicensed retailers on Staten Island, New York City as follows:

(1) Between March 28, 1944, and August 14, 1944, six orders for one Piscopo, whose license had been revoked by the Authority in December, 1942.

(2) [a] Between March 28, 1944, and August 14, 1944, six orders for Alabama Club, Inc., 523 Tomkins Avenue, Rosebank, Staten Island, to which no license had ever been issued. A license had been issued at that address to one Migliore, but that license had been surrendered on November 8, 1943.

[b] During the period from March 28, 1944, to August 14, 1944, eight orders for Brass Rail, Inc., 4263 Hylan Boulevard, Great Kills, which had never been licensed. A license issued to one Andrzejak at that address had been surrendered on December 1, 1942.

(3) Eleven orders over an undisclosed period for Bill's Wild Cat at 3292 Hylan Boulevard, Dongan Hills. It does not appear that a license had ever been issued under that name but one had been issued at *3291* Hylan Boulevard, etc., for Deacon Wilde Cat, Inc., which had been surrendered on October 1, 1942. A new license was issued on August 8, 1944, to Vindvill's Inc., at the same address.

(4) Between February 25, 1944, and April 18, 1944, three orders for one Peter Crane at premises for which there was no license in effect from January 1, 1944, to April 30, 1944, although for some undisclosed period there had been a summer license.

(5) Over a period from March 28, 1944, to May 18, 1944, three orders for one Leo Berna at premises which had been licensed for the sale of beer only.

(6) During the period from December 1, 1943, to August 14, 1944, ten orders for one Savoco, who had been unlicensed since **March, 1942.**

(7) On March 28, 1944, one order for one Cornell, whose last license was a summer license for the year 1943.

Standard concedes that no check or inquiry was made by those in its (1) order department, (2) credit department, (3) shipping department or (4) delivery department for the purpose of learning whether the orders above mentioned were for licensees or for licensed premises. Standard concedes further that under the statute, " if a sale or delivery is made to an unlicensed person it is wholly immaterial whether the sale was made through inadvertence, negligence or otherwise " but argues that " in this case there is ample proof in the record that petitioner took all reasonable precautions to prevent sales to unlicensed persons. It instructed the salesmen not to take orders from unlicensed customers. It instructed the drivers not to make deliveries to unlicensed premises and, except on C.O.D. orders *where no question of credit was involved* all license numbers were checked by the credit department." (Emphasis supplied.)

Precautions and instructions to employees are no defense. As Standard itself phrased it they are immaterial. Standard was not doing business as a matter of right but as a matter of privilege under a license by the State. It was obligated by statute and agreement to take no orders for unlicensed persons and to make no deliveries to anyone other than licensed persons. Here it did both. That its salesman placed with it orders for liquor for unlicensed persons in order that with the connivance of a truck driver he might appropriate the liquor for himself, was no defense. The orders were for unlicensed persons and unlicensed premises. The fact that the salesman was dishonest could not make the persons or premises licensed ones, nor constitute an excuse for not performing a statutory duty. A simple inquiry would have disclosed the absence of licenses. A conspiracy between the salesman and truck driver worked no change in the obligations of Standard. The orders remained orders for unlicensed persons and the deliveries to the truckman were deliveries for unlicensed persons and premises, and, upon conversion of the merchandise by the salesman and truck driver, were still deliveries to unlicensed persons. Both receipt and acceptance of the orders and the deliveries of the liquor constituted sales within the definition in the act (*supra*). While the failure here to employ honest and law-abiding salesmen was not

available to Standard as an excuse for failure to check the orders upon its books, it should be pointed out that a reading of the Alcoholic Beverage Control Law in its entirety clearly discloses the legislative intent to put the burden of compliance and obedience upon a licensee such as Standard, since it conducts its business as a matter of favor and not as a matter of right. See especially section 2.

Finally, that Standard relied upon a distiller's lists of licensees to whom beverages might be allocated during a shortage, and thus fell into the same errors as the distiller, was clearly no defense.

The question whether under section 118, subdivision 6, the license of Standard should have been revoked rather than suspended has not been argued and we do not pass upon it.

There was ample substantial and competent evidence to sustain the determination of the Authority and the order of the Appellate Division should be affirmed, with costs.

LOUGHRAN, Ch. J., LEWIS and THACHER, JJ., concur with DYE, J.; CONWAY, J., dissents in opinion in which DESMOND, J., concurs.

Order reversed, etc.